

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---

CALVIN McMILLAN,

        Plaintiff,

        v.

NATIONAL FOOTBALL LEAGUE and

WISCONSIN DEPARTMENT OF REVENUE,

        Defendants.

U.S. District Court
Wisconsin Eastern

APR · 8 2026

FILED
Clerk of Court

Case No.: 26-cv-594

**COMPLAINT**

---

## INTRODUCTION

**1.** This is a federal antitrust action brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, challenging Defendants' unlawful monopolization and conspiracy to monopolize the market for lottery tickets and sports memorabilia featuring professional football teams and players.

**2.** Plaintiff also asserts supplemental claims for copyright infringement under 17 U.S.C. § 501, based on Defendants' unauthorized commercial use of Plaintiff's original copyrighted song lyrics.

**3.** Plaintiff seeks injunctive relief, monetary damages in the amount of nine million dollars ($9,000,000), and such other relief as the Court deems just and proper.

# I. JURISDICTION AND VENUE

**4.** This Court has subject matter jurisdiction over Plaintiff's Sherman Act claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 15 U.S.C. § 15, which provides a private right of action for enforcement of Sherman Act violations.

**5.** This Court has supplemental jurisdiction over Plaintiff's copyright infringement claims under 28 U.S.C. § 1338(a), which grants federal courts original jurisdiction over copyright claims, and 28 U.S.C. § 1367, which grants supplemental jurisdiction over related state law claims arising from the same operative facts.

**6.** Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b). Plaintiff resides in Green Bay, Wisconsin, which is located within the Eastern District of Wisconsin. Substantial events giving rise to this action occurred in Wisconsin, and Defendants conduct substantial business activities in Wisconsin.

**7.** Defendant National Football League operates the Green Bay Packers franchise in Green Bay, Wisconsin, and licenses sports-related products throughout Wisconsin and nationwide.

**8.** Defendant Wisconsin Department of Revenue is a state agency headquartered in Madison, Wisconsin, within the Western District of Wisconsin, but conducts business throughout the state including the Eastern District.

# II. PARTIES

**9.** Plaintiff Calvin McMillan is an individual residing at 2330 Meadow Park Dr, Green Bay, Wisconsin 54311. Plaintiff is a business person and entertainer who has created original musical compositions and sought to compete in the market for lottery tickets and sports memorabilia featuring professional football teams.

**10.** Defendant National Football League ("NFL") is an unincorporated association with its principal place of business at 345 Park Ave, New York, New York 10154. The NFL controls and licenses the use of professional football team names, logos, player likenesses, and related intellectual property for commercial purposes throughout the United States.

**11.** Defendant Wisconsin Department of Revenue ("Wisconsin DOR") is a state agency with its principal office at 2135 Rim Rock Rd, Madison, Wisconsin 54713. Wisconsin DOR administers and oversees Wisconsin lottery operations, including the sale of lottery tickets featuring sports themes and professional sports teams.

**12.** Defendants are sophisticated business entities with knowledge of, and the ability to enter into, agreements affecting commerce in the relevant markets described below.

### III. RELEVANT MARKETS

**13.** The relevant product market consists of lottery tickets and sports memorabilia featuring professional football teams, players, and related entertainment products. These products share common characteristics of consumer appeal based on professional football fandom, are marketed to overlapping consumer bases, and exhibit cross-elasticity of demand in that consumers purchase these products as complementary expressions of team loyalty and entertainment.

**14.** Consumers regard lottery tickets featuring professional football themes and sports memorabilia as reasonably interchangeable products for purposes of entertainment, team affiliation, and the opportunity to win prizes associated with professional football.

**15.** The relevant geographic market is multi-state and national in scope, encompassing Wisconsin and other states throughout the United States where Defendants sell or license lottery tickets and sports memorabilia featuring professional football teams. The market is national

because the NFL operates franchises and licenses products in multiple states, and state lotteries coordinate with the NFL to offer football-themed products across state lines.

16. The relevant market is substantial and economically significant, generating revenues in the hundreds of millions of dollars annually from the sale of lottery tickets and memorabilia featuring professional football content.

17. Plaintiff intended to compete in this market and had the capability, resources, and creative content necessary to offer competitive products to consumers.

## IV. DEFENDANTS' MONOPOLY POWER AND MARKET POSITION

18. Defendants collectively possess monopoly power in the relevant market for lottery tickets and sports memorabilia featuring professional football teams and players.

19. The NFL exercises exclusive control over the licensing of all professional football team names, logos, trademarks, and player likenesses for use in commercial products. No competitor can legally sell lottery tickets or memorabilia featuring NFL teams without obtaining a license from the NFL.

20. Wisconsin DOR exercises monopoly control over the sale of lottery tickets in Wisconsin, as state law grants Wisconsin DOR exclusive authority to operate the state lottery and to authorize retailers to sell lottery products.

21. Through their combined control over NFL licensing and state lottery operations, Defendants collectively possess the power to raise prices, restrict output, exclude competitors, and control consumer choice in the market for lottery tickets and memorabilia featuring professional football content.

**22.** Significant barriers to entry prevent competitors from challenging Defendants' market position, including the NFL's legal monopoly over team names and logos, state lottery laws restricting entry, and the substantial capital and licensing costs required to compete effectively.

**23.** Defendants have the ability to raise prices for lottery tickets and memorabilia above competitive levels without losing significant customers, as evidenced by premium pricing for NFL-themed lottery products compared to generic lottery tickets.

**24.** Smaller competitors and new entrants, including Plaintiff, are unable to compete effectively in this market due to Defendants' exclusionary conduct described below.

**25.** Defendants' market power was not achieved through superior products, business acumen, or legitimate competition, but rather through the anticompetitive agreement and exclusionary conduct alleged in this Complaint.

## V. THE ANTICOMPETITIVE AGREEMENT AND EXCLUSIONARY CONDUCT

**26.** Beginning approximately one to three years ago and continuing to the present, Defendants entered into and maintained an agreement, combination, or conspiracy (written and/or oral, express and/or implied) to monopolize and restrain trade in the market for lottery tickets and sports memorabilia featuring professional football teams and players.

**27.** The agreement included provisions and understandings to exclude Plaintiff and other competitors from the market for lottery tickets and memorabilia featuring professional football content, and to restrict who could license, produce, and sell these products.

**28.** Specifically, the agreement provided that Wisconsin DOR would sell lottery tickets featuring NFL teams and content only through distributors and retailers approved by both Defendants, and

that the NFL would license its intellectual property for use in Wisconsin lottery products only to entities approved by Wisconsin DOR.

**29.** Plaintiff discovered the existence of this anticompetitive agreement in or around September 2024, when Plaintiff sought to enter the market and was foreclosed from doing so by Defendants' coordinated refusal to deal with Plaintiff.

**30.** The existence and terms of the anticompetitive agreement are evidenced by the conduct of Defendants, including their parallel refusal to deal with Plaintiff, their coordinated licensing practices, communications between Defendants regarding lottery product licensing, and testimony from industry participants with knowledge of the agreement.

**31.** Witnesses with knowledge of the lottery and sports memorabilia industry have confirmed that Defendants coordinate their licensing and distribution decisions, and that this coordination is not normal competitive practice but rather an agreement to restrict market access.

**32.** Through this agreement, Defendants engaged in specific anticompetitive conduct including: (a) conspiring to exclude Plaintiff from selling lottery tickets featuring professional football teams; (b) conspiring to prevent Plaintiff from selling sports memorabilia and entertainment products featuring NFL content; and (c) conspiring to restrict licensing of entertainment products and intellectual property related to professional football to entities selected by Defendants to the exclusion of independent competitors like Plaintiff.

## VI. PLAINTIFF'S EXCLUSION FROM THE MARKET

**33.** Plaintiff sought to enter the market for lottery tickets and sports memorabilia featuring professional football teams and to license entertainment products based on Plaintiff's original creative works celebrating the Green Bay Packers and professional football.

**34.** Plaintiff had the capability, intent, financial resources, and creative content necessary to compete effectively in this market and to offer valuable products and services to consumers.

**35.** Plaintiff approached Defendants seeking to obtain licensing rights and business opportunities to sell lottery products and memorabilia featuring professional football content.

**36.** Defendants refused to work with Plaintiff, instead awarding exclusive licenses and distribution rights to other companies and entities selected by Defendants pursuant to their anticompetitive agreement.

**37.** Plaintiff was foreclosed from the market despite having the ability to compete effectively and to offer superior products and services.

**38.** Defendants' refusal to deal with Plaintiff was not based on legitimate business reasons or competitive considerations, but rather was pursuant to the anticompetitive agreement to exclude Plaintiff and maintain Defendants' monopoly power.

## VII. HARM TO PLAINTIFF'S BUSINESS AND REPUTATION

**39.** As a direct result of Defendants' anticompetitive conduct and exclusionary agreement, Plaintiff lost the opportunity to establish a profitable business in the market for lottery tickets and sports memorabilia featuring professional football content.

**40.** Plaintiff's nightclub business was harmed through redlining and exclusion from credit and banking relationships, which Plaintiff believes was caused by or related to Defendants' conduct in foreclosing Plaintiff from business opportunities.

**41.** Plaintiff lost employment opportunities and income as an entertainer due to defamation and reputational harm caused by Defendants' exclusion of Plaintiff from the industry and market.

**42.** Plaintiff's ability to derive economic value from Plaintiff's creative works was diminished by Defendants' anticompetitive conduct and unauthorized use of Plaintiff's copyrighted materials.

## VIII. DEFENDANTS' COPYRIGHT INFRINGEMENT

**43.** Plaintiff is the author and copyright owner of original musical compositions and lyrics, including works titled "Pack Attack" and "Go Pack Go."

**44.** These original works feature professional football themes and were created by Plaintiff for use in entertainment and commercial products celebrating the Green Bay Packers and professional football.

**45.** Plaintiff's works are original creative expressions protected by federal copyright law and are registered or intended to be registered with the United States Copyright Office.

**46.** Without Plaintiff's permission, consent, or compensation, Defendants used Plaintiff's copyrighted lyrics and musical compositions in the sale and marketing of lottery tickets and sports memorabilia.

**47.** Defendants reproduced, distributed, and publicly displayed Plaintiff's copyrighted works "Pack Attack" and "Go Pack Go" in lottery ticket marketing materials, memorabilia products, and commercial advertisements.

**48.** Defendants derived significant revenues from products and services that featured or incorporated Plaintiff's copyrighted works without providing any attribution or compensation to Plaintiff.

**49.** Defendants' unauthorized use of Plaintiff's copyrighted works constitutes willful and deliberate copyright infringement under 17 U.S.C. § 501.

**50.** Defendants' copyright infringement was part of their broader anticompetitive scheme to exclude Plaintiff from competing in the entertainment and memorabilia market. By using Plaintiff's works without compensation or attribution, Defendants unfairly competed with Plaintiff and prevented Plaintiff from capturing the market value from Plaintiff's own creative works.

## IX. ANTICOMPETITIVE EFFECTS IN THE MARKET

**51.** Defendants' anticompetitive agreement and exclusionary conduct have had substantial anticompetitive effects in the relevant market for lottery tickets and sports memorabilia featuring professional football content.

**52.** Prices for lottery products and memorabilia featuring NFL content are elevated above competitive levels due to Defendants' monopoly power and coordinated pricing practices.

**53.** Consumer choice is limited to products and services approved by Defendants, depriving consumers of the benefit of competition from independent providers like Plaintiff.

**54.** New entrants and competitors are unable to compete effectively in the market due to Defendants' exclusionary conduct and barriers to entry created by Defendants' agreement.

**55.** Innovation and product diversity are suppressed because Defendants control which products enter the market and exclude innovative competitors like Plaintiff who could offer consumers new and valuable products.

## X. DAMAGES TO PLAINTIFF

**56.** As a direct and proximate result of Defendants' anticompetitive conduct, conspiracy to monopolize, and copyright infringement, Plaintiff has suffered actual damages in the amount of nine million dollars ($9,000,000).

**57.** Plaintiff's damages include: (a) lost profits from business opportunities in the lottery ticket and sports memorabilia market that Plaintiff was prevented from pursuing; (b) loss of business property, specifically Plaintiff's nightclub, which was harmed through redlining and exclusion from credit relationships related to Defendants' conduct; (c) lost employment income as an entertainer due to defamation and reputational harm caused by Defendants' exclusionary practices; (d) diminution in value of Plaintiff's copyrighted works due to Defendants' unauthorized use without compensation and Plaintiff's resulting inability to license these works; and (e) harm to Plaintiff's business reputation and relationships.

**58.** Under the Clayton Act, 15 U.S.C. § 15, Plaintiff is entitled to recover three times the actual damages sustained, for total treble damages of twenty-seven million dollars ($27,000,000), plus the costs of this action including reasonable attorney's fees.

## COUNT I

## MONOPOLIZATION IN VIOLATION OF SHERMAN ACT § 2

### (15 U.S.C. § 2)

**59.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**60.** Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization of any part of trade or commerce among the several states. To establish monopolization under this provision, a plaintiff must prove two elements: possession of monopoly power in the relevant market, and the willful

acquisition or maintenance of that power through exclusionary conduct as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., 384 U.S. 563 (1966).

61. Defendants possess monopoly power in the relevant market for lottery tickets and sports memorabilia featuring professional football teams and players, as alleged in Paragraphs 18 through 25 above.

62. Defendants willfully acquired and maintained this monopoly power through exclusionary conduct, specifically through entering into an anticompetitive agreement to exclude competitors like Plaintiff from the market, refusing to deal with Plaintiff on any terms, and using their combined market power to foreclose competition.

63. Defendants' monopoly power was not achieved through superior products, business acumen, or legitimate competition, but rather through the anticompetitive agreement and exclusionary practices described in this Complaint.

64. Defendants' monopolization has harmed competition in the relevant market and has caused antitrust injury to Plaintiff, as alleged in Paragraphs 39 through 42 and 56 through 57 above.

65. Defendants' conduct constitutes monopolization in violation of 15 U.S.C. § 2.

## COUNT II

## CONSPIRACY TO MONOPOLIZE IN VIOLATION OF SHERMAN ACT § 2

### (15 U.S.C. § 2)

66. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**67.** Section 2 of the Sherman Act prohibits any person from combining or conspiring with any other person to monopolize any part of trade or commerce among the several states. 15 U.S.C. § 2.

**68.** Defendants entered into and maintained an agreement, combination, and conspiracy to monopolize the relevant market for lottery tickets and sports memorabilia featuring professional football content, as alleged in Paragraphs 26 through 32 above.

**69.** Defendants had knowledge of and participated in the conspiracy with the specific intent to achieve and maintain monopoly power in the relevant market.

**70.** Through their conspiracy, Defendants engaged in overt acts in furtherance of the conspiracy, including coordinating their licensing decisions, refusing to deal with Plaintiff, excluding Plaintiff from the market, and using Plaintiff's copyrighted works without permission as part of their scheme to foreclose competition.

**71.** Defendants' conspiracy has succeeded in achieving and maintaining monopoly power in the relevant market, and has caused antitrust injury to Plaintiff and harm to competition.

**72.** Defendants' conduct constitutes conspiracy to monopolize in violation of 15 U.S.C. § 2.

## COUNT III

## ATTEMPTED MONOPOLIZATION IN VIOLATION OF SHERMAN ACT § 2

(15 U.S.C. § 2 — Alleged in the Alternative)

**73.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**74.** In the alternative, if the Court finds that Defendants have not yet achieved complete monopoly power, Defendants have attempted to monopolize the relevant market in violation of

Sherman Act § 2. To establish attempted monopolization, a plaintiff must prove that the defendant engaged in predatory or anticompetitive conduct with a specific intent to monopolize, and that there is a dangerous probability of achieving monopoly power. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993).

**75.** Defendants engaged in predatory and anticompetitive conduct by entering into an agreement to exclude Plaintiff and other competitors from the market, refusing to deal with Plaintiff, and using their combined market power to foreclose competition.

**76.** Defendants acted with the specific intent to monopolize the relevant market, as evidenced by their coordinated conduct to exclude competitors and maintain control over licensing and distribution of lottery tickets and memorabilia featuring professional football content.

**77.** There is a dangerous probability that Defendants will achieve monopoly power in the relevant market, given their substantial market shares, control over essential licensing rights, barriers to entry, and ongoing exclusionary conduct.

**78.** Defendants' conduct constitutes attempted monopolization in violation of 15 U.S.C. § 2.


## COUNT IV

## COPYRIGHT INFRINGEMENT

(17 U.S.C. § 501)

**79.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**80.** Plaintiff is the author and owner of valid copyrights in original musical compositions titled "Pack Attack" and "Go Pack Go," as alleged in Paragraphs 43 through 45 above.

**81.** Defendants had access to Plaintiff's copyrighted works and reproduced, distributed, and publicly displayed these works without Plaintiff's authorization, as alleged in Paragraphs 46 through 48 above.

**82.** Defendants' unauthorized use of Plaintiff's copyrighted works in lottery tickets, memorabilia, and marketing materials constitutes copyright infringement under 17 U.S.C. § 501.

**83.** Defendants' infringement was willful and deliberate, undertaken for commercial gain and with knowledge that the works belonged to Plaintiff.

**84.** As a direct result of Defendants' copyright infringement, Plaintiff has been damaged in the loss of licensing revenues, diminution in value of the copyrighted works, and loss of market opportunities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Calvin McMillan respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

**1.** A permanent injunction enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, from continuing to engage in the anticompetitive conduct alleged in this Complaint, including but not limited to excluding Plaintiff from the market for lottery tickets and sports memorabilia featuring professional football content;

**2.** A permanent injunction prohibiting Defendants from using Plaintiff's copyrighted works without Plaintiff's permission and requiring Defendants to cease all infringing uses;

**3.** Monetary damages in the amount of nine million dollars ($9,000,000) in actual damages, which Plaintiff is entitled to treble under 15 U.S.C. § 15, for a total award of twenty-seven million dollars ($27,000,000);

**4.** Reasonable attorney's fees and costs of suit, as provided by 15 U.S.C. § 15 and applicable law;

**5.** Pre-judgment and post-judgment interest as allowed by law; and

**6.** Such other and further relief as the Court deems just and proper.

Respectfully submitted,

4/8/2026

CALVIN McMILLAN

Plaintiff, Pro Se

2330 Meadow Park Dr

Green Bay, Wisconsin 54311

920-321-8800